UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HORNBECK OFFSHORE
TRANSPORTATION, LLC,

    Plaintiff,

      v.

UNITED STATES COAST GUARD, *et al.*,

    Defendants.

Civil Action No. 04-1724 (CKK)

**MEMORANDUM OPINION**
(March 27, 2006)

Plaintiff Hornbeck Offshore Transportation, LLC ("Hornbeck"), a limited liability company

which owns and operates oil transport vessels, brings this action against Defendants the United

States Coast Guard and the United States of America (collectively, "Defendants" or "the Agency")

alleging that (1) the Agency's assignment of a phase-out date under the Oil Pollution Act of 1990

("OPA 90"), Pub. L. 101-380, 104 Stat. 484 (1990), of January 1, 2005, rather than January 1,

2015, for its tank barge "ENERGY 8701" was contrary to law, arbitrary and capricious, and in

violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, *see* First Am.

Compl. ¶¶ 31-35 (Count I – Violation of APA), ¶¶ 36-40 (Count II – Violation of APA); and (2)

the Agency's failure to provide certain requested documents constituted a violation of the Freedom

of Information Act ("FOIA"), 5 U.S.C. § 552, *id.* ¶¶ 41-47 (Count III – Violation of FOIA), ¶¶ 48-

54 (Count IV – Violation of FOIA).[1]  Currently before the Court is Plaintiff's Motion for Summary

---

[1] This Court, on March 20, 2006, issued a Memorandum Opinion and Order that granted-in-part and denied-in-part Defendants' Motion for Summary Judgment as to Counts III and IV of Plaintiff's First Amended Complaint, and denied Plaintiff's Cross-Motion for Summary Judgment on Counts III and IV (FOIA Claims).  Specifically, the Court granted Defendants' Motion for Summary Judgment with respect to the adequacy of its search, and its withholdings/productions

Judgment as to Counts I and II of Plaintiff's First Amended Complaint (Plaintiff's APA claims),

Defendants' Opposition and Cross-Motion for Summary Judgment on Counts I and II, and

Plaintiff's Opposition and Reply.

Upon a searching examination of the parties' filings, the attached exhibits, the relevant case

law, and the entire administrative record provided, the Court shall grant Plaintiff's Motion for

Summary Judgment as to Counts I and II of Plaintiff's First Amended Complaint and shall deny

Defendants' Cross-Motion for Summary Judgment.

## I: BACKGROUND

A.     *Statutory Framework*

1.     The Oil Pollution Act of 1990

In response to the disastrous March 1989 oil spill involving the EXXON VALDEZ in Prince

William Sound, Alaska, Congress passed the Oil Pollution Act of 1990 ("OPA 90"), Pub. L. 101-

380, 104 Stat. 484 (1990).  OPA 90 requires that all newly constructed tank vessels engaged in the

marine transportation of oil in the United States be constructed with double hulls.  *See* 46 U.S.C. §

3703(a) ("Except as otherwise provided in this section, a vessel to which this chapter applies shall be

equipped with a double hull . . . .").  A "double hull" is a ship hull design method where the bottom

and sides of the ship have two complete layers of watertight hull surface:  one outer layer forming

---

pursuant to FOIA Exemptions 4 and 6.  However, due to the identified problems with the Agency's
*Vaughn* Index and accompanying affidavits with respect to the documents withheld pursuant to
FOIA Exemption 5, the Court denied Defendants' Motion for Summary Judgment with respect to its
Exemption 5 withholdings.  As such, the Court ordered Defendants to submit a new *Vaughn* Index
as to the documents withheld pursuant to FOIA Exemption 5 with proper detailed document
descriptions and reasons for withholding that illuminate the contents of the documents and the
reasons for nondisclosure by Monday, May 8, 2006, with supplemental briefing to follow.  *See*
*Hornbeck Offshore Transp., LLC v. U.S. Coast Guard*, Civ. No. 04-1724, 2006 WL 696053
(D.D.C. Mar. 20, 2006).

the normal hull of the ship, and a second inner hull which is somewhat further into the ship, perhaps a few feet, which forms a redundant barrier to seawater in case the outer hull is damaged and leaks. Double hulls are significantly safer than single hulls.  In the case of grounding or other underwater damage, most of the time the damage is limited to flooding the bottom compartment, and the main occupied areas of the ship remain intact.  In the case of a collision with another ship, most of the time the damage is limited to flooding the side compartment, and the main occupied compartments also remain intact.  The provisions of the OPA requiring that all newly constructed tank vessels be provided double hulls apply, *inter alia*, to a U.S. vessel if it "is constructed or adapted to carry, or carries, oil in bulk as cargo or cargo residue" and when the vessel is "operating on the waters subject to the jurisdiction of the United States, including the Exclusive Economic Zone." *Id*. § 3703a(a)(1) & (2).

In addition to its requirements regarding the construction of double hulled tank vessels, OPA 90 also requires that all U.S. single hull tank vessels, including tank barges, existing at the time of OPA 90's enactment be retrofitted with double hulls in order to qualify for operation on the navigable waters of the United States or the waters of the Exclusive Economic Zone of the United States.  *Id*. § 3703a(c).  Any single hull tank vessel not retrofitted in such a manner must be phased out of service in accordance with a statutory schedule, which began to have effect on January 1, 1995.  *Id*. § 3703a(c)(3).  The phase-out schedule of OPA 90 is based upon the gross tonnage, hull design, and construction date of the subject vessel.  *Id*.  For instance, for single hull tank vessels constructed prior to 1980, OPA 90 provides that vessels with a gross tonnage of 5000 gross tons or more must be phased-out as of January 1, 2005, while vessels with a gross tonnage of less than 5000 tons must be phased out as of January 1, 2015.  *See id*. § 3703a(c)(3)(A) & (c)(2).  Whether a single hull vessel that was built before 1980 is phased out in 2005 or 2015 depends exclusively on

the vessel's gross tonnage.

2.      The 1997 Amendment to the OPA

For the seven years following its passage, OPA 90 contained no specific authorization for waiving or extending phase-out deadlines.  However, because its deadlines were based in part on the gross tonnage of the vessel, with larger vessels generally having earlier phase-out dates, owners began obtaining *de facto* extended deadlines by reducing the documented carrying capacity of their vessels.  *See* U.S. Gen. Accounting Office, Maritime Industry:  As U.S. Single-Hull Oil Vessels Are Eliminated, Few Double Hull Vessels May Replace Them 10 (2000), *attached as* Defs.' Cross-Mot. for Summ. J., Ex. B.  For example, a vessel owner could reduce the gross tonnage of a vessel by deducting cargo-carrying tanks from a vessel's gross tonnage by re-designating such tanks as specially segregated tanks that carried only ballast water.  *Id*. at 11.

The so-called Frelinghuysen Amendment, passed on November 18, 1997, changed this landscape, eliminating this industry practice of reducing the gross tonnage of a vessel scheduled for OPA 90 phase-out so as to obtain a later phase-out date.  *Id*. at 10.  Through the Frelinghuysen Amendment to OPA 90, Congress amended 46 U.S.C. § 3703a by adding the following pertinent provision:

> (e)(1)  For the purposes of this section and except as otherwise provided in paragraphs (2) and (3) of this subsection, the gross tonnage of a vessel shall be the gross tonnage that would have been recognized by the Secretary on July 1, 1997, as the tonnage measured under section 14502 of this title, or as an alternate tonnage measured under section 14302 of this title as prescribed by the Secretary under section 14104 of this title.

46 U.S.C. § 3703a(e)(1).

3.      Tonnage Measurement Systems

A vessel's gross tonnage measurement describes its internal volume, not the weight the

4

vessel can carry or the weight of the vessel itself.  As is plain upon a reading of 46 U.S.C. §

3703a(e)(1), there are two measurement systems recognized by the United States.  Measurement

under 46 U.S.C. § 14502 is the "Regulatory" measurement system, which yields the vessel's

"Regulatory tonnage" commonly denominated "GRT."  *See* 46 U.S.C. § 14501 *et seq.*

Measurement under 46 U.S.C. § 14302 conforms with the International Convention on Tonnage

Measurement of Ships of 1969, which yields the vessel's "Convention tonnage" commonly

denominated "ITC."  *See* 46 U.S.C. § 14301 *et seq.*  The difference between a particular vessel's

Regulatory tonnage and Convention tonnage solely reflects the different measuring criteria of each

system for establishing the tonnage.  In a typical case, the Convention tonnage system of

measurement yields a higher gross tonnage than the Regulatory system.  United States law requires

that "a vessel engaged in a foreign voyage" be measured under the Convention measurement system.

*See* 46 U.S.C. § 14301(a)(3); 46 C.F.R. § 69.11(a)(1).

> B.    *The Decision Regarding ENERGY 8701's Phase-Out*

> 1.    <u>ENERGY 8701</u>

ENERGY 8701, the tank barge at the center of this dispute, is a U.S.-flag tank barge

designed to carry oil or other liquid cargo.  *See* Admin. R. at 4, 18.  A "tank barge" is a non-self-

propelled vessel specially constructed or converted to carry oil, hazardous material, or other bulk

liquid in tanks.  *See* 46 U.S.C. § 2101(39); 33 U.S.C. § 2701(34); 46 C.F.R. § 30.10-65, 151.03-

51.  Constructed in 1976, *see* Admin. R. at 4; First Am. Compl. ¶ 19, ENERGY 8701 is 360 feet

long, 64 feet wide, and 27 feet deep; when fully loaded, the vessel is capable of carrying 85,000

barrels ($\approx$3,570,000 million gallons) of oil, *see* Admin. R. at 16, 31.  On August 25, 1976, the

United States Coast Guard issued a Certificate of Admeasurement for ENERGY 8701 which

recorded the vessel's gross tonnage as 5323.19 gross tons (GRT) using the Regulatory measurement

system. *See id*. at 31.  Because ENERGY 8701 was only engaged in domestic trade at that time, its

Convention tonnage was not measured at that point.  Importantly, since its original construction,

ENERGY 8701 has undergone no physical alterations to reduce its tonnage.  *See id*. at 14.

The original owner of ENERGY 8701 was a company called Spentonbush/Red Star

Companies.  *See id*. at 4.  Plaintiff acquired the barge from Spentonbush through an affiliated

company, called LEEVAC Marine Inc., in June 2001.  *See id*. at 4.  For over two and a half years,

Plaintiff operated ENERGY 8701 and made no request to modify its gross tonnage measurement of

5323 GRT.  *See id*. at 15-16, 32.  Indeed, for nearly 30 years following its 1976 construction, no

owner or operator of ENERGY 8701 sought to have that measurement changed or to substitute an

admeasurement based on Convention tonnage for the original measurement of 5323 gross tons

(GRT) under the Regulatory system.  *Id*.  When Plaintiff acquired ENERGY 8701, it believed that

the barge would be phased out of service on January 1, 2005; indeed, the Coast Guard Certificate of

Inspection for ENERGY 8701, dated November 27, 2001 (five months after Plaintiff's purchase of

the vessel), notes that the gross tonnage of the vessel is 5323 GRT and specifically states that the

OPA 90 phase-out date for the barge is January 1, 2005.  *See id*. at 18-19; *see also* 46 U.S.C. §

3703a(c)(3)(A) (providing that single hull vessels with a gross tonnage of 5000 gross tons or more

must be phased out by January 1, 2005).

> 2. Plaintiff's Pleasant "Surprise" and Attempt to Extend ENERGY 8701's
> Phase-Out Date

In connection with a planned commercial voyage to Canada in early 2004, Plaintiff was

compelled by international law to obtain a Convention measurement for ENERGY 8701.  *See id*. at

4-5.  On February 11, 2004, Plaintiff hired the American Bureau of Shipping ("ABS") to determine

the tonnage of ENERGY 8701 under the Convention measurement system to permit the vessel to

sail on this foreign voyage. *See id.* at 32.[2]  As requested, ABS performed the necessary calculations and conducted a survey of the ENERGY 8701 in February 2004. *See id.* at 34-60.  Based upon its calculations and survey, ABS determined that the vessel's gross tonnage is 4660 gross tons (ITC) using the Convention measurement system. *See id.* at 62.  ABS issued an International Tonnage Certificate for the ENERGY 8701, delivering the certificate to the Coast Guard on February 24, 2004. *See id.* at 61-62.

Provided this new measurement of 4660 gross tons under a different system, Plaintiff believed that it was entitled to a new phase-out date for ENERGY 8701, as 46 U.S.C. § 3703a(c)(2) provides a phase-out date of January 1, 2015 for single hull vessels with a gross tonnage of less than 5000 tons.  As such, on March 8, 2004, Plaintiff requested that the Agency recognize the vessel's gross tonnage of 4660 tons and establish the ENERGY 8701's phase-out date as January 1, 2015. *See id.* at 13-14 ("Initial Request").  In support of its request, Plaintiff enclosed the International Tonnage Certificate showing the tonnage of 4660 tons and verified that ENERGY 8701 had not undergone any major conversions or substantial alternations since its 1976 construction. *Id.*  In response, the Agency assigned the Convention tonnage of 4660 gross tons (ITC) to ENERGY 8701, but denied Plaintiff's request to recognize the phase-out date of January 1, 2015, rather than January 1, 2005. *See id.* at 25.  The Agency reasoned:

> [W]e interpret the language of 46 U.S.C. § 3703(a)(e)(1) as requiring the OPA requirements to be applied using the correct regulatory measurement system tonnage for the vessel on July 1, 1997, since at that time laws of the United States were applied to the vessel using regulatory tonnage.  Accordingly, unless we are presented

---

[2] ABS is the American classification society.  Classification societies are officially recognized organizations that develop and apply technical requirements for the design, construction, and maintenance of ships.  With respect to tonnage measurement, ABS is qualified to perform the Convention measurement and authorized by the Coast Guard to issue a certificate for the vessel. *See* 46 C.F.R. §§ 69.27, 69.15; 46 U.S.C. §§ 3316(a) & (b)(1).

with evidence of an error in the 1976 admeasurement, the tonnage for applying the
OPA 90 requirements is 5323 GRT.

*Id*. at 26.

On July 29, 2004, Plaintiff appealed the initial Agency decision to Agency Headquarters.

*See id*. at 1-12 ("Appeal").  Plaintiff, in its appeal, contended that the Agency had erroneously

applied 46 U.S.C. § 3703a(e) and had treated other vessels – namely, two barges owned by a

competitor of Plaintiff, Bouchard, identified as "B. NO. 95" and "B. NO. 105" – in a disparate

manner under the same statute.[3]  *See id*. at 5-9.  On September 15, 2004, the Agency denied

Plaintiff's appeal.  In doing so, the Agency stated:

> Section 3703a of title 46 United States Code states that the "gross tonnage of a
> vehicle shall be the gross tonnage that would have been recognized by the Secretary
> on July 1, 1997."  We agree with the Marine Safety Center's interpretation that the
> vessel's tonnage as of July 1, 1997, is the tonnage to be used in determining the OPA
> 90 phase out.  The gross tonnage of the barge ENERGY 8701 on July 1, 1997 was
> 5323.19 tons, measured under the standard [i.e., Regulatory] measurement system
> used for regulatory purposes.

*See* Pl.'s Mot. for Summ. J., Ex. 2 (9/15/05 Letter from Joseph J. Angelo to Samuel A. Giberga)

("Final Action Letter").  The Agency's only stated rationale in rebuttal to Plaintiff's accusation of

disparate treatment was an argument that Bouchard had *applied* for a tonnage change before July 1,

1997 (although the tonnage change had not been issued as of that date); as such, Bouchard was

allowed to extend the phase-out date for its barges from January 1, 2005 to January 1, 2015, but

Plaintiff – which had not applied for such a change prior to July 1, 1997 – was not allowed an

extension.  *Id*.

---

[3] Plaintiff learned of these other barges after the Agency provided the initial response to its
contemporaneous FOIA request.  *See* Pl.'s Mot. for Summ. J. at 5 n.28.

8

Following the Agency's denial of its appeal, Plaintiff filed a Complaint in this Court on

October 8, 2004.  *See* Compl.  Plaintiff contends, *inter alia*, that the Agency Action violated the

parameters of the APA for two reasons.  First, Plaintiff asserts that "[t]he Agency's action is contrary

to the plain language of 46 U.S.C. § 3703a(e)."  First Am. Compl. ¶ 33 (Count I – APA).  Second,

Plaintiff argues that "[t]he Agency's failure to treat legally indistinguishable circumstances alike" –

i.e., its application as compared to Bouchard's application – "is arbitrary and capricious and

otherwise not in accordance with law and is therefore contrary to the Administrative Procedure Act."

*Id.* ¶ 39 (Count II – APA).

## II: LEGAL STANDARDS

### A.     *Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56*

A party is entitled to summary judgment if the pleadings, depositions, and affidavits

demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638

(D.C. Cir. 1994).  Under the summary judgment standard, Defendant, as the moving party, bears the

"initial responsibility of informing the district court of the basis for [its] motion, and identifying

those portions of the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of

material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986).  Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his]

own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific

facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the

nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary

judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d

202  (1986).  To be material, the factual assertion must be capable of affecting the substantive

outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible

evidence that a reasonable trier-of-fact could find for the nonmoving party.  *Laningham v. U.S.*

*Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251, 106 S.Ct. 2505

(the court must determine "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  "If

the evidence is merely colorable, or is not sufficiently probative, summary judgment may be

granted."  *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. 2505 (internal citations omitted).  "Mere

allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper

motion for summary judgment."  *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The

adverse party must do more than simply "show that there is some metaphysical doubt as to the

material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986).  Instead, while the movant bears the initial responsibility of

identifying those portions of the record that demonstrate the absence of a genuine issue of material

fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is

a *genuine issue for trial.*'"  *Id.* at 587, 106 S.Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in

original).

  B.  *Standards for Administrative Agency Review*

  Plaintiff in this case challenges the Agency's construction of the phase-out provision of OPA

90, specifically, the Agency's interpretation of the 1997 Amendment to OPA 90, 46 U.S.C. §

3703a(e)(1).  The standard for the Court's review of such challenges is known as *Chevron* review,

after the Supreme Court's decision in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S.

837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The central question for the reviewing court under

*Chevron* "is whether the agency's construction of the statute is faithful to its plain meaning, or, if

the statute has no plain meaning, whether the agency's interpretation 'is based on a permissible

construction of the statute.'" *Arent v. Shalala*, 70 F.3d 610, 615 (D.C. Cir. 1995) (quoting

*Chevron*, 467 U.S. at 843, 104 S.Ct. 2778). Under the *Chevron* analysis, a court first asks

"whether Congress has directly spoken to the precise question at issue. If the intent of Congress is

clear, that is the end of the matter; for the court, as well as the agency, must give effect to the

unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43, 104 S.Ct. 2778; *see*

*also id*. at 843 n.9, 104 S.Ct. 2778 ("[A]dministrative constructions which are contrary to clear

congressional intent" must be rejected by the court). "When performing this first step, [courts]

employ traditional tools of statutory construction." *Indep. Ins. Agents of Am., Inc. v. Hawke*, 211

F.3d 638, 643 (D.C. Cir. 2000) (citing *Chevron*, 467 U.S. at 842-43, 104 S.Ct. 2778; *INS v.*

*Cardoza-Fonseca*, 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)). Among these

tools is a statute's legislative history. *See Am. Fed'n of Labor & Congress of Indus. Orgs. v. Fed.*

*Election Comm'n*, 333 F.3d 168, 172 (D.C. Cir. 2003) ("*AFL-CIO*"); *Am. Bankers Ass'n v. Nat'l*

*Credit Union Admin.*, 38 F. Supp. 2d 114, 134 (D.D.C. 1999); *see also Nat. Res. Def. Council v.*

*Browner*, 57 F.3d 1122, 1127 (D.C. Cir. 1995) ("Reference to statutory design and pertinent

legislative history may often shed new light on congressional intent, notwithstanding statutory

language that appears 'superficially clear.'") (quoting *Am. Scholastic TV Programming Found. v.*

*Fed. Commc'ns Comm'n*, 46 F.3d 1173, 1178 (D.C. Cir. 1995)). However, canons of construction

are only to be used during step one of the *Chevron* analysis to determine if "Congress had a *specific*

intent on the issue in question." *Mich. Citizens for an Indep. Press v. Thornburgh*, 868 F.2d 1285, 1292-93 (D.C. Cir. 1989) (emphasis in original).  In conducting this stage of the *Chevron* analysis, the Court "giv[es] no deference to the agency's interpretation." *AFL-CIO*, 333 F.3d at 173.

If the court finds that "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778.  "A statute is considered ambiguous if it can be read more than one way." *AFL-CIO*, 333 F.3d at 173.  "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n.11, 104 S.Ct. 2778.  Therefore

> [w]hen a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail.  In such a case, federal judges – who have no constituency – have a duty to respect legitimate policy choices made by those who do.  The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones:  "Our Constitution vests such responsibilities in the political branches."

*Id*. at 866, 104 S.Ct. 2778 (quoting *TVA v. Hill*, 437 U.S. 153, 195, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978)).  However, if the Agency's interpretation unduly compromises the statute's "purposes, it is not a 'reasonable accommodation' under the Act, and it would therefore not be entitled to deference." *Orloski v. Fed. Election Comm'n*, 795 F.2d 156, 164 (D.C. Cir. 1986) (quoting *Chevron*, 467 U.S. at 845, 104 S.Ct. 2778); *see also Chevron*, 467 U.S. at 845, 104 S.Ct. 2778 (providing that if the agency's "choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress

would have sanctioned.") (quoting *United States v. Shimer*, 367 U.S. 374, 382, 81 S.Ct. 1554, 6

L.Ed.2d 908 (1961)); *Common Cause v. Fed. Election Comm'n*, 692 F. Supp. 1391, 1396 (D.D.C.

1987) ("[W]here the agency interprets its statute in a way that flatly contradicts Congress's express

purpose, the court may – indeed must – intervene and correct the agency.").

In addition to their *Chevron* challenge, Plaintiff also contends that the Agency abused its

discretion in an "arbitrary and capricious" manner in failing to offer a "reasoned analysis" for its

decision with respect to ENERGY 8701.  According to Plaintiff, the Agency treated legally

indistinguishable vessels differently and failed to follow its own rules.  The Administrative

Procedure Act ("APA") provides that "[t]he reviewing court shall . . . hold unlawful and set aside

agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

> The scope of review under the "arbitrary and capricious" standard is narrow and a court
> is not to substitute its judgment for that of the agency.  Nevertheless, the agency must
> examine the relevant data and articulate a satisfactory explanation for its action
> including a rational connection between the facts found and the choice made.  In
> reviewing that explanation, we must consider whether the decision was based on a
> consideration of the relevant factors and whether there has been a clear error of
> judgment.  Normally, an agency rule would be arbitrary and capricious if the agency
> has relied on factors which Congress has not intended it to consider, entirely failed to
> consider an important aspect of the problem, offered an explanation for its decision that
> runs counter to the evidence before the agency, or is so implausible that it could not be
> ascribed to a difference in view or the product of agency expertise. The reviewing court
> should not attempt itself to make up for such deficiencies:  We may not supply a
> reasoned basis for the agency's action that the agency itself has not given.  We will,
> however, uphold a decision of less than ideal clarity if the agency's path may reasonably
> be discerned.

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (internal citations and quotation marks omitted);

*see also Cellco P'ship v. Fed. Commc'ns Comm'n*, 357 F.3d 88, 93-94 (D.C. Cir. 2004) (noting

"arbitrary and capricious" review is "highly deferential . . . presum[ing] the validity of agency

action . . . [which] must [be] affirm[ed] unless the Commission failed to consider relevant factors or made a clear error in judgment."). The "reasoned analysis" requirement is "not 'particularly demanding,'" and "is satisfied if the agency 'enables us to see what major issues of policy were ventilated and why the agency reacted to them as it did.'" *Republican Nat'l Comm. v. Fed. Election Comm'n*, 76 F.3d 400, 407 (D.C. Cir. 1996), *cert. denied*, 519 U.S. 1055, 117 S.Ct. 682, 136 L.Ed.2d 607 (1997) (quoting *Pub. Citizen, Inc. v. Fed. Aviation Admin.*, 988 F.2d 186, 197 (D.C. Cir. 1993) (internal punctuation omitted). Moreover, the Court "must affirm if a rational basis for the agency's decision exists." *Bolden v. Blue Cross & Blue Shield Ass'n*, 848 F.2d 201, 205 (D.C. Cir. 1988). The degree of deference a court should pay an agency's construction is, however, affected by "the thoroughness, validity, and consistency of an agency's reasoning." *Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981). Moreover, this Circuit has noted that "a permissible statutory construction under *Chevron* is not always reasonable under *State Farm*: 'we might determine that although not barred by statute, an agency's action is arbitrary and capricious because the agency has not considered certain relevant factors or articulated any rationale for its choice.'" *Republican Nat'l Comm.*, 76 F.3d at 407 (quoting *Arent*, 70 F.3d at 620 (Wald, J., concurring in the judgment)).

### III: DISCUSSION

The Court shall begin its examination of the Agency's decision vis-á-vis the proper phase-out date for ENERGY 8701 by analyzing what level of deference, if any, should be afforded to its construction of the relevant statutes. The Court shall then turn to an investigation of the statutory scheme in question, looking at the plain language of the relevant provisions, Congressional intent, and the interaction between the various subsections. Because the Court concludes that the Agency violated the APA by failing to follow plain statutory language, the Court shall grant Plaintiff's

Motion for Summary Judgment with respect to Count I of their First Amended Complaint.  Given

that this decision essentially awards the relief requested by Plaintiff, the Court shall decline to

address Plaintiff's second argument, i.e., that the Agency's disparate treatment of their vessel

constituted "arbitrary and capricious" action in violation of the APA.

A.     *The Agency's Construction of the Relevant Statutes Warrants No Deference*

As noted above, under APA review, a court must first apply the "traditional tools of

statutory construction to determine whether Congress has spoken to the precise question at issue."

*Cal. Indep. Sys. Operator Corp. v. Fed. Energy Regulatory Comm'n*, 372 F.3d 395, 399 (D.C.

Cir. 2004) (citing *Chevron*, 467 U.S. at 842-43 & n.9, 104 S.Ct. 2778).  Under step one of the

*Chevron* analysis, if the intent of Congress is clear, the court (as well as the agency) must give effect

to the unambiguously expressed intent of Congress.  *Id.*; *see also Chevron*, 467 U.S. at 842-43, 104

S.Ct. 2778.  The court is to proceed to step two of the *Chevron* analysis – wherein it considers (1)

whether the agency acted within its delegated authority, and (2) whether the agency's interpretation

of the statute is reasonable – only if the statute is silent or ambiguous with respect to the specific

issue. *Id.*; *see also Chevron*, 467 U.S. at 843-44, 104 S.Ct. 2778.

Here, the Agency contends that it "is entitled to *Chevron* deference," because such deference

is owed to agencies in the course of informal adjudications, including letter opinions, *see* Defs.'

Opp'n & Cross-Mot. at 15-16 (citing *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*,

513 U.S. 251, 256-58, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995)), and because the nature of the legal

question presented in this case, the related expertise of the Agency, the importance of the question to

the administration of the statute, the complexity of that administration, and the careful consideration

the Agency had given the question over a long period of time indicate that such deference should be

afforded, *id.* (citing *United States v. Mead Corp.*, 533 U.S. 218, 230, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)).  In the alternative, the Agency suggests that its interpretation should receive the lower *Skidmore* deference, wherein an agency's position may be accorded respect depending on its persuasiveness.  *See id.* at 16-17 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

Three central flaws exist in the Agency's deference argument.  As such, the Court determines that the Agency's construction of the statutes relevant to this dispute, particularly 46 U.S.C. § 3703a(e)(1), warrants no deference.

1.      The Statutes' Plain Language Controls

Here, the Agency itself proclaims that "OPA 90, as amended by the Frelinghuysen Amendment, is clear and unambiguous" and argues "that the Coast Guard properly applied the statute to ENERGY 8701 in a straightforward manner."  Defs.' Opp'n & Cross-Mot. at 17; *see also id.* (contending that "the Coast Guard's determination . . . is consistent with the plain language of the applicable provisions of OPA 90 . . . ."); *see also id.* at 10, 11, 15 (extolling the "plain language" of OPA 90).  Plaintiff also contends that the relevant statutes are plain on their face.  *See* Pl.'s Mot. for Summ. J. at 7.  Given that both parties concede both that the statutes contain no ambiguity and that the plain language controls their application, the Agency is essentially asserting – incorrectly – deference in a situation where it admits the resolution is step one of the *Chevron* review.

Indeed, the Agency's claim of deference contradicts both its own position that the plain language of the relevant statutes controls and the Supreme Court's admonition:

> The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.  If a court, employing traditional tools of statutory construction, ascertains that Congress

16

had an intention on the precise question at issue, that intention is the law and must be given effect.

*Chevron*, 467 U.S. at 843 n.9, 104 S.Ct. 2778.  As discussed *infra*, Section III(B), the Court is in agreement with the parties that the plain language of OPA 90 and the relevant tonnage measurement statutes is clear and unambiguous, and that the Agency is bound by that language.  Where the Court can easily discern Congressional intent from the statutes' plain language, the Court's APA review terminates at step one of the *Chevron* review and the Agency's construction is owed no deference.

2.      The Agency's Most Recent Construction is a *Post-Hoc* Rationalization Deserving of No Deference Because It Differs from the Stated Rationale in the Agency Action

Moreover, even assuming *arguendo* the ambiguity of the relevant statutes, the Agency's most recent construction would warrant no deference, as it differs considerably from the stated rationale in the Agency Action.  Importantly, in its Opposition and Cross-Motion for Summary Judgment, the Agency asserts for the first time that it "could not have recognized [ENERGY 8701's] Convention gross tonnage measurement as of July 1, 1997 when none existed" on that date or had been requested by that date.  Defs.' Opp'n & Cross-Mot. at 6.  As such, the Agency's most recent position requires that Plaintiff, in order to be successful in altering the phase-out date, should have acquired a Convention tonnage measurement on or before July 1, 1997.

However, at the time of the Agency Action, the Agency relied on a different construction of the same statute – i.e., 46 U.S.C. § 3703a(e)(1).  On March 29, 2004, the Agency denied Plaintiff's request to change ENERGY 8701's phase-out date, stating:

[W]e interpret the language of 46 U.S.C. § 3703(a)(e)(1) as requiring the OPA requirements to be applied using the correct regulatory measurement system tonnage for the vessel on July 1, 1997, since at that time laws of the United States were applied to the vessel using regulatory tonnage.  Accordingly, unless we are presented with evidence of an error in the 1976 admeasurement, the tonnage for applying the OPA 90 requirements is 5323 GRT.

17

Admin. R. at 26 ("Initial Response").  The Agency reiterated this reasoning in its September 15, 2004 denial of Plaintiff's appeal:

> Section 3703a of title 46 United States Code states that the "gross tonnage of a vehicle shall be the gross tonnage that would have been recognized by the Secretary on July 1, 1997."  We agree with the Marine Safety Center's interpretation that the vessel's tonnage as of July 1, 1997, is the tonnage to be used in determining the OPA 90 phase out.  The gross tonnage of the barge ENERGY 8701 on July 1, 1997 was 5323.19 tons, measured under the standard [i.e., Regulatory] measurement system used for regulatory purposes.

*See* Pl.'s Mot. for Summ. J., Ex. 2 (9/15/05 Letter from Joseph J. Angelo to Samuel A. Giberga) ("Final Action Letter").

The shift in the Agency's position, while subtle, is important.  If correct, the original rationale set forth in the Agency Action would render the Agency's treatment of the two Bouchard barges – which also only had Regulatory tonnages assigned to them on July 1, 1997 – unlawful. With respect to the two Bouchard barges, B. NO. 95 and B. NO. 105, Bouchard applied for a tonnage reduction of its barges on December 19, 1997, shortly after the passage of the Frelinghuysen Amendment on November 18, 1997 and prior to the statutory deadline of January 1, 1998 for submission of such applications.  *See* Admin. R. at 88.  Although Bouchard had requested the new admeasurements for these barges in March and June 1996, respectively, it did not physically obtain the new admeasurements from ABS until June 19, 1997 (for B. NO. 95) and November 3, 1998 (for B. NO. 105).  *See id.* at 83, 88.  Because (1) the new Convention measurements for the Bouchard barges fell under 5000 gross tons (ITC), and (2) Bouchard sought the new admeasurements 17 months before the Frelinghuysen Amendment was passed, the Agency granted Bouchard's application and extended the OPA 90 phase-out dates for its barges to January 1, 2015. *See id.* at 83; *see also* Defs.' Opp'n & Cross-Mot. at 28-29.  However, it is true that on July 1, 1997, Bouchard had not obtained a new admeasurement for one of its vessels (B. NO. 105) and it

18

had not yet applied for a tonnage reduction.  As such, under the Agency's reasoning as outlined to

Plaintiff during its appeals process, it appears that one or both of the Bouchard vessels should have

been denied a phase-out extension.  The Agency's new construction is an attempt to save it from

such an outcome, and to draw a new distinction between Bouchard and Plaintiff here.

Such an explanation by the Agency is clearly a *post hoc* rationalization.  "Agency decisions

must generally be affirmed on the grounds stated in them."  *Ass'n of Civilian Technicians v. Fed.*

*Labor Relations Auth.*, 269 F.3d 1112, 1117 (D.C. Cir. 2001) (citing *Fort Stewart Schs. v. Fed.*

*Labor Relations Auth.*, 495 U.S. 641, 651-52, 110 S.Ct. 2043, 109 L.Ed.2d 659 (1990) ("[I]t is

elementary that if an agency's decision is to be sustained in the courts on any rationale under which

the agency's factual or legal determinations are entitled to deference, it must be upheld on the

rationale set forth by the agency itself."); *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 93-

95, 63 S.Ct. 454, 87 L.Ed.2d 626 (1943)).  "Post-hoc rationalizations, developed for litigation[,] are

insufficient."  *Id.* (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct.

239, 9 L.Ed.2d 207 (1962) ("The courts may not accept appellate counsel's post hoc

rationalizations for agency action . . . .")).  As such, even assuming *arguendo* that the relevant

statutes were ambiguous and the Court was required to proceed to *Chevron* step two, the Court

could only give deference to and base its decision upon the Agency's initial construction of the

statute as represented to Plaintiff.  *See id*.  The Agency's later construction, expressed in its

Opposition and Cross-Motion for Summary Judgment, is a *post hoc* rationalization improperly

before the Court and unworthy of deference.

3.      *Skidmore* Deference Would Be Inappropriate in this Situation

Also assuming *arguendo* that the relevant statutes were not plain on their face, the Agency's

claim that its actions warrant *Skidmore* deference, i.e., "some deference whatever its form, given the specialized experience and broader investigations and information available to the [A]geny," Defs.' Opp'n & Cross-Mot. at 9 (quoting *Skidmore*, 323 U.S. at 139, 65 S.Ct. 161), is also without merit. Importantly, *Skidmore* deference, commonly referred to as "the power to persuade," ultimately hinges upon the ability of an agency to convince the court that its rationale merits respect. *See Mead*, 533 U.S. at 219, 121 S.Ct. 2164. As the Supreme Court has explained, "[t]he weight accorded to an administrative judgment 'will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Id.* (quoting *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161).

Assuming that the Court reached step two of a *Chevron* review, the Agency would not be owed *Skidmore* deference, as three important factors prevent its reasoning from being persuasive. First, as discussed *infra* Section III(B), the Agency's application runs counter to the relevant statutes' plain language. Second, there is nothing in the administrative record that shows that the Agency utilized any specialized knowledge or information. Indeed, the Agency itself neither required nor performed any risk analysis in this case; such a risk analysis might have implicated its specialized knowledge, but – in the absence of such analysis – there is little in the administrative record reflecting such knowledge and reasoning. Third, the inconsistency with respect to the Agency's "earlier and later" pronouncements – both between Plaintiff's request and the earlier Bouchard request, and between the Agency's pronouncements in the Agency Action and its rationale in this proceeding – defeats any claim to *Skidmore* deference. Accordingly, where the Agency's construction of the statute lacks both logic and consistency, no deference would be due.

B.     *The Plain Language of the Relevant Statutes Contradicts the Agency's Interpretation*

Two separate but interlocking statutory schemes are relevant to this dispute.  First, the Frelinghuysen Amendment, codified as 46 U.S.C. § 3703a(e), is particularly important, given that the Agency exclusively relied upon this provision as the source of its authority to deny Plaintiff's phase-out date modification request.  *See* Admin. R. at 26 ("Initial Response"); Pl.'s Mot. for Summ. J., Ex. 2 (9/15/05 Letter from Joseph J. Angelo to Samuel A. Giberga) ("Final Action Letter").  Second, the laws pertaining to tonnage measurement systems are crucial as well, given that Plaintiff contends that these statutes allow it, as the owner of ENERGY 8701, to select the tonnage measurement system to be used in accord with the tonnage laws' optional provisions.  The Court shall assess each of these schemes in turn.  Ultimately, such a review highlights the fact that the Agency's construction of the relevant statutes is contrary to their plain language and therefore is in violation of the APA.

1.     <u>The Agency Misreads 46 U.S.C. § 3703a(e)</u>

a.     *Plain Language*

With respect to statutory construction, the Supreme Court has emphasized that "[i]n ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."  *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988) (citations omitted). The "first step" in the canon of statutory construction is to "begin with a 'plain language' analysis of the statutory text."  *Cal. Indep. Sys. Operator Corp.*, 372 F.3d at 400.  That is, the court is to assume "that the legislative purpose is expressed by the ordinary meaning of the words used."  *Sec. Indus. Ass'n v. Bd. of Governors*, 468 U.S. 137, 149, 104 S.Ct. 2979, 82 L.Ed.2d 107 (1984).  "Where []

21

the plain language of the statute is clear, the court generally will not inquire further into its

meaning." *Qi-Zhuo v. Meissner*, 70 F.3d 136, 140 (D.C. Cir. 1995).

The central statutory provision at the crux of this dispute is 46 U.S.C. § 3703a(e)(1),

particularly this highlighted portion:

> For the purposes of this section and except as otherwise provided in paragraphs (2)
> and (3) of this subsection, the gross tonnage of a vessel shall be the gross tonnage
> *that would have been recognized* by the Secretary on July 1, 1997, as the tonnage
> measured under section 14502 of this title, or as an alternate tonnage measured
> under section 14302 of this title as prescribed by the Secretary under section 14104
> of this title.

*Id.* (emphasis added).

Under the Agency's construction of this provision, only a measurement that existed as of

July 1, 1997 could be recognized by the Agency for the purposes of establishing an OPA 90 phase-

out date; any remeasurement after that date could not be recognized. *See* Defs.' Opp'n & Cross-

Mot. at 6 ("Coast Guard simply could not have recognized a Convention tonnage . . . where none

existed"); at 11 ("Coast Guard would not have recognized a gross tonnage . . . that did not exist"); at

19 ("Coast Guard could not have recognized a gross tonnage measurement that did not exist").  In

support of this interpretation, the Agency inserts verbs and tenses not enacted into law by Congress

in a way that shifts the plain meaning of the provision's language.  *See Nat'l Pub. Radio, Inc. v.

Fed. Commc'ns Corp.*, 254 F.3d 226, 230 (D.C. Cir. 2001) ("we must presume that Congress

meant precisely what it said").[4]

---

[4] Moreover, "[i]nartful drafting is not the same as ambiguity." *Nat'l Pub. Radio*, 254 F.3d
at 229; *see also Meredith v. Fed. Mine Safety & Health Review Comm.*, 177 F.3d 1042, 1053
(D.C. Cir. 1999) ("[T]hre presence of a difficult question of statutory construction does not
necessarily render that provision ambiguous for purposes of *Chevron*.").

Here, the Agency reads the relevant portion as "the gross tonnage that *was recognized* by the Secretary on July 1, 1997." Such a reading would support its ultimate finding in the Agency Action with respect to Plaintiff's request: since ENERGY 8701's only gross tonnage measurement on July 1, 1997 was 5323 gross tons (GRT), and the later Convention tonnage measurement of 4660 gross tons (ITC) was not discovered until 2004, then the gross tonnage that "was recognized" by the Secretary on July 1, 1997 was 5323 tons, entailing a phase-out date of January 1, 2005. Unfortunately for the Agency, the statute reads "*would have been recognized*" – not "was recognized." This difference is key – by employing this plain language, Congress specifically incorporated the optional nature of the tonnage measurement statutes. *See* 46 U.S.C. § 3703a(e); *see also infra* Section III(B)(2) (for a discussion of the optional nature of the tonnage measurement statutes). The subpart fixes the determination of the tonnage on a hypothetical measurement of a particular vessel on the specified date – July 1, 1997 – under the optional Regulatory or Convention measurement systems. Indeed, by employing the language "would have been recognized," Congress intended that either measurement system could be applied to ENERGY 8701 as it existed on July 1, 1997.

The application of the plain language of the statute to the ENERGY 8701 shows the clear error in the Agency's Action. Here, it is uncontested that since its original construction in 1976, ENERGY 8701 has undergone no physical alterations to reduce its tonnage. *See* Admin. R. at 14. As such, the vessel as it existed on July 1, 1997 is essentially identical to the vessel as it exists today. *See* Defs.' Opp'n & Cross-Mot. at 19 ("ENERGY 8701 is more or less the same tank barge today as it was in 1976 when it was first constructed. The barge's physical dimensions have not changed materially – at least not in a manner that is legally significant for the purposes of the Court's analysis."). Because the statute plainly does not ask what the tonnage *was* under a specific system

23

on July 1, 1997, but instead looks at what the tonnage *would have been* if measured under either

the system set forth in Section 14502 (the Regulatory measurement system) or in Section 14302 (the

Convention measurement system), the fact that ENERGY 8701's tonnage on July 1, 1997 was

5323 gross tons (GRT) is not wholly determinative of its phase-out date.  Rather, because the

provision specifies "would have been recognized," the vessel's Convention measurement must be

consulted as well.  In this case, even though ENERGY 8701's Convention tonnage had not actually

been recognized by the Secretary on July 1, 1997, if measured, that tonnage "would have been

recognized" as 4660 gross tons (ITC).  Under the phase-out provisions of 46 U.S.C. § 3703a, a

vessel with a weight of 4660 gross tons that "would have been recognized" by the Secretary on July

1, 1997 has a phase-out date of January 1, 2015.  *See* 46 U.S.C. § 3073a(c)(2).  The Agency's

failure to recognize the plain language and meaning of 46 U.S.C. § 3703a(e) ensured that it gave

ENERGY 8701 an incorrect phase-out date of January 1, 2005.  Such an action was arbitrary,

capricious, and otherwise not in accordance with the law, in violation of the APA, 5 U.S.C. §

706(2)(A).

        *b.*      *Interaction Between the Statute's Provisions*

     A review of the statutory provisions *in pari materia* with 46 U.S.C. § 3703a(e) supports this

reading of the plain language of the statute and contradicts the Agency's construction.  This Circuit

follows the canon of statutory construction that holds that "[s]tatutory provisions *in pari materia*

normally are construed together to discern their meaning."  *Motion Picture Ass'n of Am., Inc. v.*

*Fed. Commc'ns Comm'n*, 309 F.3d 796, 801 (D.C. Cir. 2002) (citing *Erlenbaugh v. United*

*States*, 409 U.S. 239, 244, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972) (noting that the rule that statutes *in*

*pari materia* should be construed together "is . . . a logical extension of the principle that individual

sections of a single statute should be construed together")); *see also Holyoke Water Power Co. v. Fed. Energy Regulatory Comm'n*, 799 F.2d 755, 766 (D.C. Cir. 1986) ("The three sections are *in pari materia* and must be read together."); *FAIC Secs., Inc. v. United States*, 768 F.2d 352, 363 (D.C. Cir. 1985) ("[T]hese two statutes are *in pari materia* and must be construed together."). The Agency, by confining its analysis to 46 U.S.C. § 3703a(e)(1), misreads both the meaning and purpose of the statute.

Importantly, the Frelinghuysen Amendment to OPA 90 is codified as 46 U.S.C. § 3703a(e)(1)-(3). Upon a reading of the entirety of the amendment, it is clear that the Agency is misapplying Section 3703a(e) to ENERGY 8701. In fact, reading the amendment as a whole, rather than in isolation as the Agency did, explains the provision's true purpose.

Section 3703a(e)(1) – the part relied upon by the Agency – sets out the rule establishing July 1, 1997 as the relevant reference point in time for a vessel's *physical* configuration, and provides for exceptions from that rule in paragraphs (2) and (3). *See* 46 U.S.C. § 3703a(e)(1). Paragraph (2) allows for waivers from the rule if the Agency finds, among other things, that "the owner of the tank vessel has entered into a binding agreement to *alter* the tank vessel in a shipyard . . . to reduce the gross tonnage of the tank vessel." *Id*. § 3703a(e)(2) (emphasis added). Paragraph (3) excludes any vessel that "had undergone, or was the subject of a contract for, *alterations* that reduce the gross tonnage of the tank vessel" before the July 1997 deadline set in paragraph (1). *Id*. § 3703a(e)(3) (emphasis added).

Reading the provision enacted by Congress as a whole, as it was intended, it is clear that Congress plainly sought to restrict the physical alterations of vessels after July 1, 1997 to avoid an otherwise applicable OPA 90 phase-out schedule. Such an intention, while certainly admirable, is

simply inapplicable to ENERGY 8701.  It is uncontested that ENERGY 8701 has not undergone

any substantial physical alterations since its construction, either before or after July 1, 1997.  As

such, the Agency's decision to apply a portion of a provision limiting the ability of vessel owners to

escape an OPA 90 phase-out through a physical alteration to a situation where no physical alteration

has occurred is simply illogical and contrary to the plain meaning of the statute.  Indeed, the

Agency's interpretation of Section 3703a(e)(1) ignores the plain language of the provision as a

whole, which is plainly contradictory to its construction of the statute.

This misconstrual of Section 3703a(e) compels the Agency to make certain arguments that

are unfounded, such as an accusation that Plaintiff's construction of the statute "renders the July 1,

1997 deadline mere surplusage and meaningless."  *See* Defs.' Opp'n & Cross-Mot. at 20.  Such a

contention is without merit.  Upon a reading of both the plain language of Section 3703a(e)(1) and

its reading in conjunction with paragraphs (2) and (3), the July 1, 1997 date is not "mere

surplusage" or "meaningless."  Rather, July 1, 1997 is an important deadline that cuts off the date

on which vessels may be physically altered to avoid an otherwise applicable OPA 90 phase-out date.

However, July 1, 1997 is not a remeasurement application deadline, as the Agency suggests.  No

portion of the statute is rendered meaningless or converted to mere surplusage under this correct

construction.  *Cf. Duncan v. Walker*, 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001)

(courts should be reluctant to treat statutory terms as surplusage in any setting, and especially when

a term occupies a pivotal place within the statutory scheme).  Instead, each part of the 1997

Amendment plays a function:  paragraph (1) states a general rule that a vessel's tonnage

measurements must relate back to the vessel's physical configuration as of July 1, 1997; paragraph

(2) establishes a mechanism to obtain a waiver for future conversion; and paragraph (3) grants an

exemption for those that had undergone or were undergoing physical alterations at the time of

enactment.

###### c.     Legislative History

While the plain language of the statute in question and the reading of that provision in relation to its related subparts contradicts the Agency's construction, the Agency may establish the legitimacy of its construction by looking to the legislative history of the law at issue.  However, the presumption in favor of the plain language of the provision is rebuttable only in the "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters."  *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (internal quotation omitted).  The Agency's burden in rebutting the clear language is onerous:  the Agency must "show either that, as a matter of historical fact, Congress did not mean what it appears to have said, or that, as a matter of logic and statutory structure, it almost surely could not have meant it."  *Engine Mfrs. Ass'n v. Envtl. Prot. Agency*, 88 F.3d 1075, 1089 (D.C. Cir. 1996); *see also Griffin v. Oceanic Contractors*, 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) (courts may ignore plain language in a narrow category of cases where "the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters").  Here, the Agency cannot meet this high standard, and a consultation of the legislative history behind the Frelinghuysen Amendment actually supports Plaintiff's position.

The Agency offers three types of "background" material to support its interpretation of Section 3703a(e):  (1) a GAO Report, *see* U.S. Gen. Accounting Office, Maritime Industry:  As U.S. Single-Hull Oil Vessels Are Eliminated, Few Double Hull Vessels May Replace Them (2000), *attached as* Defs.' Cross-Mot. for Summ. J., Ex. B; (2) a single sentence from the 1997 Amendment's legislative history, *see* H.R. Conf. Rep. 105-340 (1997), *attached as* Defs.' Cross-Mot. for Summ. J., Ex. C; and (3) a prior draft of the 1997 Amendment, *see* 143 Cong. Rec.

H4169-01 (daily ed. June 23, 1997) (draft offered by Rep. Frelinghuysen), *attached as* Defs.'

Cross-Mot. for Summ. J., Ex. D.  A review of these materials indicates a lack of support for the

Agency's position.

First, with respect to the Year 2000 GAO Report, two points are in order:  (1) the GAO

Report, drafted three years after the Frelinghuysen Amendment, is not legislative history and is not

part of the administrative record; and (2) the Report does not stand for the broad proposition asserted

by the Agency.  As the GAO Report describes the 1997 Amendment:  "Public Law 105-85

mandated that after July 1, 1997, a vessel's phase-out deadline would not change as a result of a

*reduction in carrying capacity* unless the U.S. Department of Transportation (DOT) [the Coast

Guard's parent agency] granted a waiver allowing it."  *See* U.S. Gen. Accounting Office, Maritime

Industry:  As U.S. Single-Hull Oil Vessels Are Eliminated, Few Double Hull Vessels May Replace

Them 12 (2000), *attached as* Defs.' Cross-Mot. for Summ. J., Ex. B (emphasis added).  As such,

neither the text nor the context of the GAO Report supports the application of the 1997 Amendment

to anything more than physical alterations and associated waivers.  Because no physical alteration

took place with respect to ENERGY 8701, the GAO Report is consistent with the plain language of

the statute indicating that Section 3703a(e) does not apply to the vessel.

Second, with respect to the single line of the 1997 Amendment's legislative history

highlighted by the Agency, the Conference Report – as quoted by the Agency – refers to the

"industry practice of *reducing* the gross tonnage of single hull tank vessels."  *See* H.R. Conf. Rep.

105-340, at 917, *reprinted in* 1997 U.S.C.C.A.N. at 2703 (emphasis added).  By referring to the

reduction of tonnage, the report is consistent with the plain language of the statute that refers to

physical alterations and nothing more.  Indeed, the Conference Report does not discuss the

circumstances of this case, where Plaintiff has merely elected to use the Convention tonnage of the

unaltered vessel.

Third, and finally, a comparison between the 1997 Amendment as enacted with the amendment as originally proposed reveals that Section 3703a(e) does not apply to the circumstances of ENERGY 8701's remeasurement. The Frelinghuysen Amendment, as originally proposed, read:

> Section 3703 of title 46, United States Code, is amended by adding at the end the following:
>
> "(e)  For purposes of this section, the gross tonnage of a vessel for which a tonnage certificate was issued or accepted by the Secretary under this title before July 1, 1997, shall be the gross tonnage of the vessel stated on the most recent certificate."

143 Cong. Rec. H4202 (daily ed. June 23, 1997). As originally proposed, the Amendment would have used only the most recent tonnage certificate that existed for a subject vessel before July 1, 1997 as the determining measurement for the vessel's OPA 90 phase-out date. Indeed, if this amendment as drafted had become the law, Plaintiff's APA claim would have ultimately failed; ENERGY 8701's most recent certificate as of July 1, 1997 stated that the vessel was 5323 gross tons (GRT), which would have ensured a phase-out date of January 1, 2005. *See* 46 U.S.C. § 3703a(c)(3)(A).

However, the conference committee specifically changed the proposed 1997 Amendment to "clarify the circumstances under which the House provision [i.e., the 1997 Amendment as proposed] would apply." H.R. Conf. Rep. 105-340, at 917, *reprinted in* 1997 U.S.C.C.A.N. at 2703. The committee removed the reference to the vessel's tonnage certificate as of July 1, 1997, and instead looked to "the gross tonnage of a vessel . . . that would have been recognized by the Secretary on July 1, 1997." *See* 46 U.S.C. § 3703a(e)(1). By removing the reference to the vessel's tonnage certificate as of July 1, 1997 and replacing it with the detailed waiver and exclusion system, both of which deal exclusively with *physical* alterations to reduce tonnage, the conference committee

revised the operation of the provision as originally proposed.  As such, the history of the 1997

Amendment reaffirms the plain language of the statute and once again contradicts the Agency's

construction.  Had Congress intended to prevent a situation such as this one, where an owner is

requesting remeasurement of an unaltered vessel after July 1, 1997, Congress could have kept the

original wording of the proposed amendment.  Congress declined this option, and instead redrafted

the provision to focus on physical alterations alone – a material difference.  The Agency's

construction, which is in accordance with the proposed amendment but not the Amendment as

actually enacted, is therefore flawed and without support.  The Agency cannot opt to enforce the

version of the 1997 Amendment that it wishes Congress had enacted; it is bound by the statute that

Congress actually enacted.

2.  <u>The Laws Pertaining to Tonnage Measurement</u>

As noted above, the Agency's construction of 46 U.S.C. § 3703a(e) is contrary to its plain

language, the meaning of the provision when read with an eye to its context, and its legislative

history.  A plain reading of Section 3703a(e) indicates that the owner of a subject vessel, such as

Plaintiff, can look to what "would have been recognized" as the tonnage of the vessel as measured

under 46 U.S.C. § 14502 (the Regulatory measurement) or under 46 U.S.C. § 14302 (the

Convention measurement) to determine the proper OPA 90 phase-out date for the vessel.  *See* 46

U.S.C. § 3703a(e)(1).  However, before that reading of Section 3703a(e) can stand, the Court must

determine whether anything within the other laws pertaining to tonnage measurement prevents this

"reach back" on the part of Plaintiff to extend ENERGY 8701's phase-out date.  A review of the

relevant statutes indicates that nothing prevents this reading of Section 3703a(e) or impedes

Plaintiff's requested "reach back."

30

   a. *The Tonnage Measurement Systems Permit Plaintiff to Select the*
     *Convention Measurement System*

Part J of Title 46 of the United States Code addresses the tonnage measurement of vessels.

*See* 46 U.S.C. §§ 14101-14522.  Chapter 143 delineates the Convention measurement system and

its applicability, *see id.* §§ 14301-14307, whereas Chapter 145 does the same for the Regulatory

measurement system, *see id.* §§ 14501-14522.  The Regulatory measurement system applies only if

(1) the vessel is not measured with the Convention measurement system, or (2) the vessel is

measured under the Convention system, but the owner requests that the Regulatory measurement be

used for certain U.S. laws.  *See id.* § 14501; *see also* 46 C.F.R. § 69.11(b) ("This system [the

Regulatory measurement system] applies to a vessel not required to be measured under the

Convention Measurement System.").  In this case, to determine which system applies, the

applicability of the Convention system must be determined.

   Under this scheme, the Convention system applies to vessels if (1) the vessel is engaged on a

foreign voyage, *see* 46 U.S.C. § 14101(4), or (2) the owner requests its application, *id.* §

14301(b)(6).[5]  If an owner exercises the option to measure the vessel under the Convention system,

that decision is binding.  *See* 46 U.S.C. § 14301(c) ("A vessel made subject to this chapter [the

Convention measurement system] at the request of the owner may be remeasured only as provided

by this chapter."); *see also* 46 C.F.R. § 69.11(a)(3).  In this case, Plaintiff's barge, ENERGY 8701,

was to be engaged on a foreign voyage to Canada, and in anticipation of that voyage Plaintiff

applied for and received remeasurement under the Convention system.  *See* Admin. R. at 32-63.  As

---

   [5] Ordinarily, the Convention measurement system applies to all documented vessels and
vessels engaged on a foreign voyage unless exempted by Section 14301(b).  *See* 46 U.S.C. §
14301(a).  However, because ENERGY 8701 is a barge, Section 14301(b) applies.  Section
14301(b)(6) reads:  "This chapter [the Convention measurement system] does not apply to a barge
(except a barge engaged on a foreign voyage) unless the owner requests."

such, in this case, Plaintiff was within its rights under 46 U.S.C. § 14301(b)(6) to select the

Convention measurement system for ENERGY 8701, and that selection became binding absent

another remeasurement request by Plaintiff.  Indeed, the Agency correctly recognized this change in

its Initial Response, stating:

> The new tonnage assignment [i.e., Convention tonnage] by the American Bureau of
> Shipping (ABS) on February 24, 2004, is 4660 GT ITC.  The tonnage originally
> assigned to the vessel [i.e., the Regulatory tonnage] by the Coast Guard on August
> 25, 1976, was 5323 GRT, and is no longer assigned to the vessel.

Admin. R. at 26 ("Initial Response").  While properly recognizing and assigning ENERGY 8701's

Convention tonnage on a "going-forward" basis, the Agency rejected Plaintiff's request to recognize

the Convention tonnage for the purposes of OPA 90.  *Id.*  The Court must now look to whether such

a decision was proper under applicable tonnage measurement law.

> b.    *OPA 90 Allows Hornbeck to Select the Tonnage Measurement
>        System Used in Accordance With the Tonnage Laws' Optional
>        Provisions*

As noted previously, according to the phase-out provision in OPA 90, a single-hull barge,

built in 1976, of less than 5000 gross tons may operate in the navigable waters of the United States

until January 1, 2015.  *See* 46 U.S.C. § 3703a(c)(2).  For the purposes of OPA 90, "gross ton" has

the meaning given that term by the Secretary under part J of Title 46.  *See* OPA 90 § 1001(12),

codified at 33 U.S.C. § 2701(12).  As set forth above, Congress allows the owner – not the Agency

– to determine whether or not to use the Convention measurement system.  *See, e.g.*, 46 U.S.C. §

14301(b)(6); *id.* § 14301(c); 46 C.F.R. § 69.11(a)(2)(v); 46 C.F.R. § 69.11(a)(3).  As noted, that

option – having been exercised by Plaintiff in this case – becomes the exclusive tonnage assignment

on the vessel for the purposes of all U.S. laws.  *See* 46 U.S.C. § 14301(c); 46 C.F.R. § 69.11(a)(3).

OPA 90 allows the gross tonnage of vessels to be measured in accordance with either the Regulatory or the Convention systems. *See* OPA 90 § 1001(12), codified at 33 U.S.C. § 2701(12). Indeed, OPA 90's phase-out schedule incorporates the optional nature of a vessel's tonnage by providing: "A vessel of less than 5,000 gross tons as measured under section 14502 of this title [Regulatory tonnage], or an alternate tonnage measured under section 14302 of this title [Convention tonnage], as prescribed by the Secretary under section 14104 of this title . . . ." 46 U.S.C. § 3703a(c)(2). This optional tonnage measurement language was added to many other maritime-related statutes in the Coast Guard Authorization Act of 1996, Pub. L. No. 104-324, § 715, 110 Stat. 3901, 3937 (1996), as well as to OPA 90.

Importantly, legislative history confirms this reading. For instance, the conference committee noted:

> Under the amendments made by these actions, vessel owners have the option to measure their vessels under the new ITC tonnage system [Convention measurement system] or the regulatory system. The Committee expect . . . [the provisions will] lead [] ultimately to the demise of the antiquated regulatory measurement system.

Conf. Rep. No. 104-854, at 116 (1996); *see also* S. Rep. No. 104-160, at 36 (1995) ("Under the amendments made by these sections, vessel owners retain their option to choose either the ITC system [Convention measurement system] or the regulatory system for the purposes of domestic requirements established prior to July 18, 1994").

As such, it is clear that the tonnage measurement statutes do not permit the Agency to pick and choose which tonnage to assign a vessel. Nor do the tonnage measurement statutes permit the Agency to unilaterally recognize one tonnage for some purposes and other tonnages for other purposes. The OPA 90 itself contemplates the use of both the Convention system and the Regulatory system. Accordingly, once an owner opts to employ the Convention measurement

system, that system applies to OPA 90 and other applicable laws, and no other system governs. *See* 46 U.S.C. § 14301(c); 46 C.F.R. § 69.11(a)(3).

> c.    *No Statute Permits the Agency to Apply the Remeasurement Only on a "Going-Forward" Basis or to Exclude the Remeasurement from the OPA 90 Analysis*

As described, the Agency in its Initial Response to Plaintiff – without citing to any authority – reassigned ENERGY 8701 a tonnage of 4660 gross tons (ITC), but refused to apply that tonnage for the purposes of the OPA 90 phase-out analysis. *See* Admin. R. at 26 ("Initial Response"). According to the Agency, it limited the use of ENERGY 8701's Convention tonnage of 4660 gross tons (ITC) to "a going forward basis" only. *See* Defs.' Opp'n & Cross-Mot. at 16.

A review of the relevant statutes indicates that no authority exists to support the Agency's position. Once an owner, such as Plaintiff, exercises the option to measure a vessel under the Convention system, that decision is binding. *See* 46 U.S.C. § 14301(c) ("A vessel made subject to this chapter at the request of the owner may be remeasured only as provided by this chapter."); *see also* 46 C.F.R. § 69.11(a)(3) (same). OPA 90 contemplates the use of the Convention system. *See* OPA 90 § 1001(12), codified at 33 U.S.C. § 2701(12); 46 U.S.C. § 3703a(c)(2). Following the issuance of an International Tonnage Certificate by the ABS for ENERGY 8701 on February 24, 2004, and the Agency's March 22, 2004 Initial Response, the official tonnage of ENERGY 8701 became 4660 gross tons (ITC). A single hull vessel of ENERGY 8701's age and tonnage has a OPA 90 phase-out date of January 1, 2015. *See* 46 U.S.C. § 3703a(c)(2). Section 3703a(e) does not restrict the application of ENERGY 8701's Convention tonnage to the OPA 90 phase-out determination because (1) it applies only to the physical modification of vessels, and it is uncontested that ENERGY 8701 underwent no physical modifications; and (2) even assuming *arguendo* that it did apply, the plain language of Section 3703a(e)(1) looks to "the gross tonnage of

34

a vessel . . . that would have been recognized by the Secretary on July 1, 1997." Had ENERGY 8701 been measured according to the Convention system on July 1, 1997, it would have a Convention tonnage of 4660 gross tons (ITC).

As such, all relevant statutes indicate that the Convention tonnage for ENERGY 8701 assigned in early 2004 is the proper tonnage for the OPA 90 analysis. While the Convention tonnage had not yet been measured as of July 1, 1997, such a fact is either (1) irrelevant to the OPA 90 analysis where no physical modification occurred, or (2) rendered irrelevant by Section 3703a(e)(1)'s "relation back" language. The Agency presents no persuasive authority to undercut this analysis, and presents no authority suggesting that it can limit the Convention tonnage afforded to ENERGY 8701 to a "going forward basis" only. Accordingly, the Court finds that the Agency's refusal to apply the plain language of Section 3703a(e), the entire OPA 90 scheme, and the tonnage measurement laws to Plaintiff's vessel was arbitrary, capricious, and otherwise not in accordance with the law in violation of the APA, 5 U.S.C. § 706(2)(A).

## IV: CONCLUSION

For the reasons set forth above, the Court grants Plaintiff's Motion for Summary Judgment as to Counts I of Plaintiff's First Amended Complaint, and denies Defendants' Cross-Motion for Summary Judgment. As this Court recently noted,

> "[u]nder settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." Accordingly, it is up to the agency to determine how to proceed next – not for the Court to decide or monitor.

*Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv.*, 281 F. Supp. 2d 1, 38 (D.D.C. 2003) (quoting *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir.1999)) (internal citation omitted). Consequently, the Court shall remand the case to the Agency for further action

consistent with this opinion.  An appropriate Order accompanies this Memorandum Opinion.


Date:   March 27, 2006


_____/s/_____

COLLEEN KOLLAR-KOTELLY
United States District Judge